UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____ )
LUIS BATIZ and CORDELIA        )
CHALLENGER,                    )  HONORABLE RENE M. BUMB, U.S.D.J.
                               )
            Plaintiff,         )    Civil Action No. 12-cv-0581
                               )            (RMB-AMD)
        v.                     )
                               )
NEW JERSEY STATE TROOPER D.K.  )
DETULLIO #7193; NEW JERSEY     )
STATE TROOPER M.D. BROWN       )
#7090; JOHN DOES NEW JERSEY    )
STATE POLICE TROOPERS 1-5,     )
                               )
            Defendants.        )
_____ )

_____

BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PURSUANT TO Fed.R.Civ.P. 56
_____

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625-0112
Attorney for Defendants


By:  Marvin L. Freeman
     Deputy Attorney General
     (609) 633-1971

## TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT...........................................1

COUNTERSTATEMENT OF FACTS........................................1

PROCEDURAL HISTORY..............................................9

STANDARD OF REVIEW.............................................10

ARGUMENTS.....................................................12

    POINT I

        PLAINTIFFS' CLAIM FOR FALSE ARREST SHOULD BE
        DISMISSED BECAUSE TROOPER DETULLIO HAD
        PROBABLE CAUSE TO ARREST ON ALL CHARGES AND
        BASED ON THE TOTALITY OF CIRCUMSTANCES,
        CORDELIA CHALLENGER'S SEIZURE DID NOT AMOUNT
        TO AN ARREST.......................................12

        a. Detullio had probable cause to arrest Luis
        Batiz for Theft....................................14

        b. Trooper Detullio had probable cause to
        arrest Batiz for Obstruction......................18

        c. Trooper Detullio had probable cause to
        arrest Batiz for Disorderly Conduct...............21

        d. Trooper Detullio had probable cause to
        arrest Batiz for Hindering Apprehension...........24

        e. Based on the totality of circumstances,
        the seizure of Cordelia Challenger did not
        rise to the level of an arrest; therefore, her
        claim for False Arrest should be dismissed........27

        f. Even if Challenger's seizure amounted to an
        arrest, Trooper Detullio had probable cause to
        arrest her for Hindering the Apprehension of
        Another...........................................35

i

POINT II

    PLAINTIFF' CLAIM FOR FALSE IMPRISONMENT SHOULD
BE DISMISSED BECAUSE TROOPER DETULLIO HAD
PROBABLE CAUSE......................................38

POINT III

    BATIZ'S 42 U.S.C. § 1983 CLAIM FOR MALICIOUS
PROSECUTION SHOULD BE DISMISSED BECAUSE
DEFENDANTS HAD PROBABLE CAUSE AND THERE IS NO
SHOWING THAT BATIZ WAS SUBJECT TO ADDITIONAL
RESTRICTIONS BEYOND THOSE ATTRIBUTABLE TO THE
CHARGES FOR WHICH PROBABLE CAUSE EXISTED.............39

    a. Detullio had probable cause to arrest Batiz
for each charge.....................................40

    b. Batiz cannot show that charge(s) for which
probable cause did not exist, resulted in
further restrictions on his liberty.................41

    c. The intervening exercise of independent
judgment broke the chain of causation between
Detullio's arrest and Batiz's incarceration.........42

POINT IV

    PLAINTIFFS' 42 U.S.C. § 1983 CLAIM FOR ABUSE
OF PROCESS SHOULD BE DISMISSED BECAUSE THERE
IS NO SHOWING THAT DEFENDANTS ABUSED THE
LEGITIMATE PURPOSE OF THE LEGAL PROCESS.............43

    a. There is no showing that Trooper Detullio
abused the legal process............................44

    b. Trooper Detullio did not have the authority
to issue an immigration detainer and when the
detainer was issued, he still did not have
sufficient information to verify Batiz's
identity............................................45

ii

POINT V

      PLAINTIFF'S 42 U.S.C. § 1983 CLAIM FOR
      CONSPIRACY TO DEPRIVE CIVIL AND CONSTITUTIONAL
      RIGHTS SHOULD BE DISMISSED BECAUSE THIS CLAIM
      CANNOT SURVIVE IF THE UNDERLYING CLAIMS ARE
      DISMISSED.........................................48

POINT VI

      TROOPER DETULLIO AND BROWN ARE ENTITLED TO
      QUALIFIED IMMUNITY.................................49

CONCLUSION................................................51

## TABLE OF AUTHORITIES

### U.S. CONSTITUTION

U.S. Const. Amend. IV.........................................27

### FEDERAL AND STATE STATUTES

42 U.S.C. § 1983.....................................9, 39, 48

8 C.F.R. § 287.7(b)(3)(b)....................................47

8 C.F.R § 287(d)(3)(d).......................................47

N.J.S.A. 2C:20-3.............................................14

N.J.S.A. 2C:20-3(a)........................................7, 8

N.J.S.A. 2C:29-1............................................19

N.J.S.A. 2C:29-3(b).........................................24

N.J.S.A. 2C:29-3.........................................7, 38

N.J.S.A. 2C:29-1A........................................7, 19

N.J.S.A. 2C:29-3A(7).........................................7

N.J.S.A. 2C:29-3A........................................8, 35

N.J.S.A. 2C:33-2A(2).....................................7, 22

### RULES

Fed. R. Civ. P. 56(c).......................................10

Fed. R. Civ. P. 56(e).......................................11

### CASES

Adams v. Selhorst,
449 Fed. Appx. 198 (3d Cir. 2011)...........................39

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986).........................................10

Barna v. City of Perth Amboy,
42 F.3d 809 (3d Cir. 1994).....................................49

Beck v. Ohio,
379 U.S. 89 (1964)........................................12, 35

Boyanowski v. Capital Area Intermediate Unit,
215 F.3d 396 (3d Cir. 2000).....................................48

Brooks v. Kyler,
204 F.3d 102 (3d Cir. 2000).....................................10

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)......................................10, 11

Curley v. Klem,
499 F.3d 199 (3d Cir. 2007).....................................49

Davenpeck v. Alford,
543 U.S. 146 (2004).............................................13

Donadio v. Cunningham
58 N.J. 309 (1971).............................................19

Dowling v. City of Philadelphia,
855 F.2d 136 (3d Cir. 1988).....................12, 13, 18, 37

Edwards v. City of Philadelphia,
860 F.2d 568 (3d Cir. 1988)..............................14, 18

Estate of Smith v. Marasco,
318 F.3d 497 (3d Cir. 2003).....................................40

Florida v. Royer,
460 U.S. 491 (1983).............................................28

Freeman v. State,
788 A.2d 867 (App. Div.), certif. denied,
72 N.J. 178 (2002).............................................42

Gebhart v. Barker,
574 Fed. Appx. 156 (3d Cir. 2014)..............................45

Gen. Refractories Co. v. Fireman's Fund Ins. Co.,
337 F.3d 297 (3d Cir. 2003).....................................45

Gerstein v. Pugh,
420 U.S. 103 (1975)....................................12, 17, 21

Groman v. Twp. of Manalapan,
47 F.3d 628 (3d Cir. 1995)....................................39

Harlow v. Fitzgerald,
457 U.S. 800 (1982)...........................................49

Hayes v. Florida,
470 U.S. 811 (1985).......................................29, 30

Herman v. City of Millville,
66 Fed. Appx. 363 (3d Cir. 2003)..............................40

Hinter v. Bryant,
502 U.S. 224 (1991)...........................................35

Hottenstein v. City of Sea Isle City,
977 F. Supp. 2d 353, 2013 WL 5603839, at *6 (D.N.J. 2013)......38

Jennings v. Shuman,
567 F.2d 1213 (3d Cir. 1989)..................................44

Johnson v. Knorr,
477 F.3d 75 (3d Cir. 2007).......................14, 18, 40, 41

Kaupp v. Texas,
538 U.S. 626 (2003).......................................28, 36

Luthe v. The City of Cape May,
49 F.Supp. 2d 380 (D.N.J. 1999)...............................50

Malley v. Briggs,
475 U.S. 335 (1986)...........................................49

Martinez v. Simonetti,
202 F.3d 625 (2d Cir. 2000)...................................13

Maryland v. Pringle,
540 U.S. 366 (2003)...........................................14

Matsushita Electric Industrial Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)........................................11, 12

Middlesex Concrete Products & Excavating Corp. v. Carteret Indus.
Ass'n, 37 N.J. 507 (1962)..................................... 48

Orsatti v. New Jersey State Police,
71 F.3d 480 (3d Cir. 1995)....................13, 18, 21, 27, 37

Paff v. Kaltenbach,
204 F.3d 425 (3d Cir. 2000)...................................13

Pearson v. Callahan,
555 U.S. 223 (2009)..........................................49

Pettit v. New Jersey,
No. 09-3735, 2011 U.S. Dist. LEXIS35452, 2011 WL 1325614, at *3
(D.N.J. March 30, 2011)(unreported)..........................38

Posr v. Doherty,
944 F.2d 91 (2d Cir. 1991)...................................40

Rose v. Bartle,
871 F.2d 331 (3d Cir. 1989)..................................44

Scott v. Harris,
550 U.S. 373 (2007)..........................................12

Sharrar v. Felsing,
128 F.3d 810 (3d Cir. 1997)..................................14

Sherwood v. Mulvihill,
113 F.3d 396 (3d Cir. 1997)..................................14

State v. Camillo,
887 A.2d 1151; 887 A.2d 1151 (App Div. 2005)..................20

State v. Crawley,
187 N.J. 440; 901 A.2d 924 (2006).............................19

Terry v. Ohio,
392 U.S. 1 (1968)............................................28

Todaro v. Bowman,
872 F.2d 43 (3d Cir. 1989)...................................10

Townes v. City of New York,
176 F.3d 138 (2d Cir.),
cert. denied, 528 U.S. 964 (1999)..........................42, 43

United States v. Coker,
223 Fed. Appx. 136 (3d Cir. 2007)..............................34

United States v. Brown,
448 F.3d 239 (3d Cir. 2006)....................................33

United States v. Edwards,
53 F.3d 616,...................................................34

United States v. Frost,
999 F.2d 737 (3d Cir. 1993)................................27, 33

United States v. Hensley,
469 U.S. 221 (1985)...........................................34

United States v. Johnson
592 F.3d 442 (3d Cir. 2010)...................................28

United States v. Mendenhall,
446 U.S. 544 (1980)...........................................27

United States v. Perea,
986 F.2d 633 (2d Cir. 1993)...................................34

United States v. Sharpe,
470 U.S. 675 (1985)...........................................29

United States v. Smith,
575 F.3d 308 (3d. Cir. 2009)..............................28, 33

Wildoner v. Borough of Ramsey,
162 N.J. 375, 744 A.2d 1146 (2000)........................39, 40

Wright v. City of Phila.,
409 F.3d 595 (3d Cir. 2005)...................................37

## **PRELIMINARY STATEMENT**

On January 31, 2012, plaintiffs Luis Batiz and his wife, Cordelia Challenger, filed a § 1983 action against New Jersey State Troopers Daniel Detullio and Michael Brown.  The action stems from plaintiffs' arrest on February 23, 2010.

Trooper Detullio was dispatched to Batiz's residence to resolve a dispute over repossession of a portable storage container.  "Pack Rat," a company that provides removable storage containers to its customers, was at plaintiffs' residence trying to repossess a portable storage unit.  When trooper Detullio arrived and did not resolve the dispute in Batiz's favor, he became upset, angry and disorderly.  Trooper Detullio arrested Batiz for disorderly conduct and several other charges.  Cordelia Challenger was arrested later that day for Hindering Apprehension, after she drove to the state police station to visit Luis Batiz.

Plaintiffs asserted claims for false arrest, false imprisonment, malicious prosecution, abuse of process and conspiracy.  However, these claims should be dismissed because the seizures were reasonable under the Fourth Amendment.

## **COUNTERSTATEMENT OF FACTS**

On February 23, 2010, Batiz summoned the police to his residence in Bridgeton, Fairfield Township, Cumberland County, New Jersey, in response to a repossession dispute.  [See Trial

1

Transcript attached hereto as "Exhibit E", p.21, line 15–18]. Pack Rat was at plaintiffs' residence attempting to repossess a portable storage unit for non-payment. Id. The storage unit was in plaintiffs' front yard. Id.

When Detullio arrived, Batiz was in his front yard arguing with Pack Rat Manager Gregory Costas. Id. at p.22, line 4–7. Unbeknownst to Detullio, before he arrived Batiz had assaulted Costas by forcing his knee into the side of Costas' ribs and he tried to kick Pack Rat's driver. [See deposition transcript of Gregory Costas attached hereto as "Exhibit N", p.14, lines 1–7 and p.17, lines 8–11]. Detullio noticed that Pack Rat's vehicle was backed up to the storage pod on the right side of plaintiffs' residence. [Exhibit E, p.22, lines 15–22]. In front of Pack Rat's vehicle was a Honda CRV that blocked Pack Rat's exit. Id. Detullio conducted a motor vehicle check and learned that the Honda CRV was registered to Batiz's wife, Cordelia Challenger, who was also at the scene. Id. at p.28, lines 4–13.

Detullio separated Batiz and Costas and spoke to each of them individually. Id. at p.23, lines 14–24. Batiz told Detullio that Pack Rat was wrongfully removing the pod from his residence. Id. at lines 19–21. Detullio then spoke to Costas, who showed Detullio the contract, rental agreement and ledger statement, which showed that Batiz was in arrears and that Pack Rat had the right to

repossess the pod. [Exhibit N, P.19, lines 1-9]. Detullio reviewed these items and went back to talk to Batiz. Id.

Detullio learned that Batiz had taken one of Pack Rat's key tools that were needed to secure the pod to Pack Rat's vehicle. [Exhibit E, p.25, lines 24-25 and p.26, lines 1-20]. Batiz admitted to Detullio that he took the key tool and hid it to stop Park Rat from leaving with the storage pod. Id. at lines 12-17. Trooper Detullio concluded that he had sufficient information to arrest Batiz for theft, but he chose not to arrest him at that time. Id. at p.27, lines 11-25, and Detullio Deposition Transcript, "Exhibit J," p.80, lines 5-13. He ordered Batiz to return the key tool to Pack Rat. [Exhibit J, p.25, line 16 through p.26, line 1 and Exhibit E, p. 44, lines 14-19]. Detullio observed that the key tool was hidden behind the door and he saw Batiz retrieve the tool from that location and return it to Pack Rat. [Exhibit J, p.25, lines 16-25]. Detullio asked Batiz for pedigree information again and he refused give his full name, date of birth, or any identification. [Exhibit E, p.26, lines 18-25].

Detullio determined that the best way to resolve the dispute was to allow Batiz to remove his personal belongings from the storage pod, and allow Pack Rat to take the empty pod and leave. [Exhibit J, p.36, lines 16-25 and p.37, lines 1-9]. Detullio made this decision because he felt it was necessary to separate the

3

parties, due to them "arguing back and forth, and by neither side willing to budge, [which] created tension." Id.  He also determined that "there was the possibility for arguments, physical disputes and possibly someone to be involved in physical altercations." Id. Therefore, he believed his decision "was a win for both parties, Mr. Batiz received his property back, the Pack Rat movers received their pod back." Id. at p.36, lines 12-25 and p.37, lines 1-6.  In contrast, Batiz considered Pack Rat to be trespassers and he became upset when Detullio did not make them leave without the pod. [See Batiz deposition transcript, attached hereto as "Exhibit O," p.44, lines 10-15 and p.46, lines 18-19].

Detullio ordered Challenger to move her vehicle. Exhibit E, p.28, lines 14-24.  Pack Rat loaded the pod onto its truck and departed. Id.  After Pack Rat departed, Trooper Detullio asked Batiz again to provide identification. Id. at p.29, lines 1 – 3. Batiz became enraged and started yelling, screaming and pointing his finger, as he demanded that Detullio and other troopers leave. Id. at p.29, lines 12-19. He continued his refusal to provide any identification and became disorderly. Id. at p.29 lines 1-25.  He engaged in this conduct in his front yard, on his patio, on the front deck and by the garage. Id. at p.29 lines 22-24.  Trooper Detullio noticed that several members of the public were observing the incident from across the street approximately thirty feet away.

4

Id. at p.47, lines 10-15.  A neighbor told Batiz's wife, Cordelia
Challenger, that she (neighbor) saw what happened. [See deposition
transcript of Cordelia Challenger, "Exhibit L," p.37, lines 15-25].

As a result of Batiz's conduct and the investigation regarding
the theft of the key tool, Detullio decided to arrest Batiz.
[Exhibit E, p.30, lines 3-5].  He was secured in the State Police
vehicle, given his Miranda warnings and once again, asked to
provide pedigree information.  Id. at p.30, lines 22-25, and p.31,
lines 1-4.  He refused to provide any identification and he was not
in possession of any forms of identification. Id. at p.30, lines 1-
13 and Exhibit J, p.103, line 16.

He was transported to the State Police barracks in Bridgeton,
New Jersey. Id. at p.32, lines 2-13.  While at the State Police
station, Batiz was asked several times for pedigree information,
but he refused. Id. at p.31, lines 5-11.  Batiz also refused to be
fingerprinted, which would have positively identified him through
the Federal Bureau of Investigation's (FBI) Automated Fingerprint
Identification System (AFIS). [Exhibit J, p.109, lines 23-25 and
p.110, lines 1-16].  Through several queries of the New Jersey
Crime Database, Detullio could not locate a driver's license, state
identification card, photograph or any identifying information on
Batiz. Id. at p.100, lines 1-23.  Based on his training and
experience, Detullio thought Batiz was trying to hide his true

identity for unlawful purposes. [Exhibit J, p.83, lines 22-25 and p.84, lines 1-12]. Detullio was not able to obtain any information to verify Batiz's identify, and because of Batiz's deceitfulness, Detullio believed that any information Batiz provided was unreliable, unless it could be verified through other means. [Exhibit J, p.96, line 13 through p.97, line 7; p.104, lines 19-25; and p.104, lines 1-22]. Detullio queried the FBI's Criminal Justice Information System and contacted Immigration and Customs Enforcement (ICE), to see if these agencies had any information on Batiz. Id. at p.100, lines 1-25, p.101, lines 1-14, and p.123, lines 10-21.

While the investigation regarding Batiz was still ongoing, Batiz's wife, Cordelia Challenger, arrived at the State Police Station where Detullio had transported Batiz. [Exhibit E, p.31, lines 17-25]. Challenger was driving the same Honda CRV that Detullio saw at the residence, which had an expired registration. [Exhibit J, p.117, lines 14-16]. Detullio questioned Challenger about Batiz's pedigree information and asked that she provide his full name. [Exhibit E, p.31, line 17 through p.32, line 25]. Challenger refused to provide any information about her husband, which Detullio determined she rightfully knew. Id. Challenger was charged and issued summons for driving and unregistered vehicle and

6

Hindering the Apprehension of Another, in violation of N.J.S.A. 2C:29-3. [Exhibit L, p.54, lines 6-25].

Detullio contacted Municipal Court Judge Casarow and presented him with facts of the case. [Exhibit J, lines 8-16]. Judge Casarow found probable cause and signed a Complaint/Warrant, charging Batiz with violation of N.J.S.A. 2C:33-2A(2), Disorderly Conduct; N.J.S.A. 2C:20-3A, Theft; N.J.S.A. 2C:29-1A, Obstruction; and N.J.S.A. 2C:29-3A(7), Hindering Apprehension. [Exhibit C]. When Batiz was charged and processed at the station, Detullio still was not certain as to his identity; therefore, the warrant depicted the name "John Doe, Aka Luis Batiz." Id. For Batiz, Judge Casarow set bail at $2,500.00 and he was lodged in the Cumberland County Jail in lieu of that amount. [Exhibit C and Exhibit J, p.140, lines 13-20. Challenger was released the same day on her own recognizance. Id.

After Batiz was lodged in the Cumberland County Jail, ICE issued an Immigration Detainer for "DOE, John AKA, Batiz, Louise. [Exhibit D]. The detainer indicated that ICE had initiated an investigation to determine if this person is subject to removal from the United States and requested that ICE be notified at least 30 days prior to release or as far in advance as possible. Id. Batiz was released approximately two weeks later, after Challenger posted bail and faxed an copy of Batiz's 1996 expired passport to

ICE. [Exhibit L, p.68, line 24 through p.69, line 17].  Challenger acknowledged that she had to provide some form of identification for Batiz to ICE and pay $300.00 to secure his release. Id.

On March 23, 2010, Detullio received a fax from the Cumberland County Jail with a copy of Batiz's passport and his criminal history record. [Exhibit J, p.144, lines 9-16].  On the same date, Detullio updated his investigative report to reflect that Batiz had been positively identified. [Exhibit A].

On August 4, 2010, Batiz was found guilty in Municipal Court of all charges except N.J.S.A. 2C:29-3A, Hindering Apprehension, for which he was acquitted. [Exhibit E, p.86, lines 2-18.  Charges against Challenger were dismissed because the summons issued to her could not be located at trial. Id. at p.7, line 22 through p.12, line 18.  Regarding hindering charges against Challenger, the court specifically stated that it did not find that "there's proof beyond a reasonable doubt of the 2C:29-3a(1)," and that "there may be evidence of other parts of 2C:29-3, but not of the 3a(1) section." Id. p.86, lines 14-18.

At a trial de novo in New Jersey Superior Court, Criminal Division, Cumberland County, Batiz was again found guilty of N.J.S.A. 2C:20-3(a), Theft, but was found not guilty of all other charges. [Exhibit G].  Judge Jean McMaster found that "there is adequate proof beyond a reasonable doubt to convict the Defendant

8

of theft." Exhibit F, p.29, lines 7-9.  The court noted that Batiz "admitted to the Trooper that he removed a key tool from the Pack Rat Movers.  He hid it at the back of the house.  And that the key tool was only return after the Trooper instructed Defendant to return it." Id. at p.28, line 15 through p.29, line 20.

On September 16, 2011, the New Jersey Superior Court, Appellate Division, reversed Batiz's theft conviction. [Exhibit, p.5-6].  The Court found that the State did not prove that Batiz's removal of the key tool was intended to be permanent, for an extended period of time, or even intended to make it unlikely that Pack Rat would recover it. Id.  The court also found that the affirmative defense of claim of right was appropriate because the State's position that this defense is restricted solely to property in which a defendant has an ownership interest is not borne out in the case law. Id.

## PROCEDURAL HISTORY

On June 3, 2013, plaintiffs, Luis Batiz and Cordelia Challenger, filed a third amended complaint and demand for jury trial. [Exhibit I].  The complaint is based on alleged federal civil rights violations pursuant to 42 U.S.C. § 1983, and pendent state law claims. Id.  In Count I, plaintiffs claim they were falsely arrested because the State Police lacked probable cause. Id.  In Count II, plaintiffs claimed false imprisonment under the

9

U.S. Constitution and the Constitution of the State of New Jersey. Id. In Count III, Batiz claims malicious prosecution based on the allegation that defendants initiated criminal proceedings against him with malice and without probable cause. Id. In Count IV, plaintiffs claim abuse of process, based on the allegation that defendants were motivated by malice by inducing the entry of an immigration detainer against Batiz. Id. Finally in Count V, plaintiffs claim violations pursuant to 42 U.S.C. § 1985 for conspiracy to deprive civil and constitutional rights, based on the allegation that defendants agreed "in some manner" to deprive them of their constitutional rights.

## STANDARD OF REVIEW

Summary judgment may be granted if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" only if a reasonable jury could possibly hold in the non-

10

movant's favor with regard to that issue.  See Id. at 248.  A fact is "material" only if it influences the outcome under the applicable law.  Id.

The moving party bears the initial burden of demonstrating either (1) that there is no genuine issue of fact and that as a matter of law, the moving party must prevail, or (2) that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden.  Celotex Corp. v. Catrett, supra, 477 U.S. at 331.  Once either showing is made, the burden shifts to the non-moving party, who must demonstrate facts which support each element for which he bears the burden and establish the existence of genuine issues of material fact.  Id.  To satisfy this burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading."  Fed. R. Civ. P. 56(e).  Rather, he must produce sufficient evidence to support a jury verdict in his favor and not just create some metaphysical doubt as to material facts.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

A mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252. Further, the court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could

believe them.  <u>Scott v. Harris</u>, 550 <u>U.S.</u> 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 <u>U.S.</u> 574, 587 (1986).

## <u>ARGUMENTS</u>

### <u>POINT I</u>

**PLAINTIFFS' CLAIM FOR FALSE ARREST SHOULD BE DISMISSED BECAUSE TROOPER DETULLIO HAD PROBABLE CAUSE TO ARREST ON ALL CHARGES AND BASED ON THE TOTALITY OF CIRCUMSTANCES, CORDELIA CHALLENGER'S SEIZURE DID NOT AMOUNT TO AN ARREST.**

"To state a Fourth Amendment claim for false arrest, a plaintiff must allege two elements: (1) that there was an arrest; and (2) that the arrest was made without probable cause." <u>Dowling v. City of Philadelphia</u>, 855 <u>F.</u>2d 136, 141 (3d Cir. 1988).  The U.S. Supreme Court has defined probable cause as "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" <u>Gerstein v. Pugh</u>, 420 <u>U.S.</u> 103, 111 (1975) <u>quoting</u> <u>Beck v. Ohio</u>, 379 <u>U.S.</u> 89, 91 (1964).  While "[p]robable cause to arrest requires more than mere suspicion . . . it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt."

Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).

Plaintiff's actual guilt of the crime for which he was arrested is immaterial as to whether the arresting officers had probable cause to arrest him. See Dowling v. City of Philadelphia, 872 F.2d 136, 141 (3d Cir. 1989)("the proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense, but whether the arresting officers had probable cause to believe the person arrested had committed the offense."). Also, "a warrantless arrest by a law [enforcement] officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Davenpeck v. Alford, 543 U.S. 146, 152 (2004). "It is well-established that a law enforcement officer has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000).

Courts are to apply a "common sense approach," based on the totality of the circumstances, to determine whether there was probable cause to arrest. Paff v. Kaltenbach, 204 F. 3d 425, 436 (3d Cir. 2000). In reviewing the totality of circumstances, a court must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint

13

of an objectively reasonable police officer, amount to probable cause." <u>Maryland v. Pringle</u>, 540 <u>U.S.</u> 366, 371 (2003)(citation omitted). Also, "the existence of probable cause [for one offense] . . . justifie[s] the arrest and defeats [the plaintiff's] claim for false arrest even if there was insufficient cause to arrest on the [second offense] alone." <u>Johnson v. Knorr</u>, 477 <u>F.</u>3d 75, (3d Cir. 2007), (<u>quoting</u> <u>Edwards v. City of Philadelphia</u>, 860 <u>F.</u>2d 568, 576 (3d Cir. 1988).

The existence of probable cause in a Section 1983 case is commonly a question of fact; however, summary judgment is appropriate when the evidence, viewed in the light most favorable to the plaintiff, could not support a determination that an officer lacked probable cause to arrest." <u>Sharrar v. Felsing</u>, 128 <u>F.</u>3d 810, 818 (3d Cir. 1997); <u>Sherwood v. Mulvihill</u>, 113 <u>F.</u>3d 396, 402 (3d Cir. 1997).

In this case, based on the totality of facts and circumstances, New Jersey State Trooper Detullio had probable cause to arrest Luis Batiz and Cordelia Challenger.

**a.   Detullio had probable cause to arrest Luis Batiz for Theft.**

"[A] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." <u>N.J.S.A.</u> 2C:20-3.

Batiz acknowledged during his deposition that when Detullio arrived, he was involved in a dispute with Pack Rat. [Exhibit O, p.30, line 2 through p.31, line 9]. Batiz stated that Pack Rat showed up in his driveway "to take the pod. And I said that you can't" Id. at p.30, lines 10-23. Detullio stated that when he arrived, Batiz and Pack Rat were "arguing with one another;" therefore, he "immediately separated the two parties." [Exhibit E, p.22, lines 7-10]. Batiz told Detullio that Pack Rat was attempting to take the pod that stored his personal belongings and that Pack Rat was trespassing. He demanded that Detullio make them leave. [Exhibit O, p.30, line 22 through p.31, line 13]. Batiz stated that after speaking to him, Detullio went over to speak with Pack Rat. Id. at p.39, lines 23-24. Batiz acknowledged that he heard Pack Rat tell Detullio that he owes a lot of money for the pod and that he is in arrears. Id. at p.40 lines 2-7. Batiz acknowledge that Detullio saw Pack Rats' contract and outstanding bills. Id. at p.40, lines 11-18. Gregory Costas, Pack Rat's General Manager, also stated in his deposition that he showed Detullio the contract, rental agreement, and bills showing that Batiz owed money. [Exhibit N, p.18, line 25 through p.19, line 7].

Costas also told Detullio that Batiz had taken the key tool or "lifting bar" that was needed to load the pod onto Pack Rat's truck. Id. at p.23, lines 13-22. At that point, Detullio initiated

15

a theft investigation involving the missing key tool. [Exhibit E, p.24, lines 8-10].  Detullio questioned Batiz, who admitted taking the key tool and hiding it on the side of his house. [Exhibit O, p. 42, lines 22-25].  Detullio asked Batiz for pedigree information, consisting of his name, date of birth and social security number, but Batiz refused to provide the requested information. [Exhibit E, p.24, lines 1-7].  Batiz acknowledged in his deposition that he refused to provide such information because that information was not relevant. [Exhibit O, p.54, line 22 through p.55, line 22].

Detullio told Batiz to return the key tool and Batiz stated that he did. Id. at p.43, lines 15-25.  Detullio was present and observed Batiz retrieve the key tool that was hidden alongside his house and return it to Pack Rat. [Exhibit E, p.26, line 5 through p.27, line 5].  He asked Batiz again for pedigree information and Batiz refused. [Exhibit E, p.27, lines 3-4].

To resolve the dispute as amicably as possible, Detullio allowed Batiz to remove his personal belongings, and Pack Rat was allowed to leave with the pod. [Exhibit J, p.25, lines 1-14]. After Pack Rat departed, Batiz became upset and continued his refusal to provide identification. [Exhibit O, p.47, lines 1-11 and p.57, lines 14-25].  Detullio arrested him for theft, in addition to other charges. [Exhibit J, lines 12-25].

Based on the above, Detullio had reasons to believe that Batiz had exercised unlawful control over Pack Rat's property to deprive him thereof.  Batiz admitted to Detullio that he took the key tool so Pack Rat could not use it to load the pod onto Pack Rat's vehicle.  Detullio also was present when Batiz retrieved the key tool and returned it to Pack Rat.  These facts clearly establish "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" Gerstein v. Pugh, 420 U.S. 103, 111 (1975) quoting Beck v. Ohio, 379 U.S. 89, 91 (1964).

Furthermore, Detullio presented the same facts to Municipal Court Judge John A. Casarow. [Exhibit J, p. 110, lines 8-16]. Judge Casarow decided that Batiz needed to be identified by one means or another and that Batiz would be detained on bail. Id. Judge Casarow signed the Complaint-Warrant, finding probable cause for Theft, Disorderly Conduct, Hindering Apprehension and Obstructing Administration of Law or Other Government Function. [Exhibit C].  He set bail in the amount of $2,500.00. Id.  After a trial in the Fairfield/Downe Municipal Court, Batiz was also found guilty of all charges, except the hindering charge. [Exhibit p.86, lines 2-18].  Batiz's conviction for theft was also affirmed after a trail De Novo in the Superior Court, Criminal Division. [Exhibit G].  Although the Superior Court, Appellate Division, subsequently

17

reversed the theft conviction, the court specifically stated that Batiz "should not have been found guilty." [Exhibit H].  However, probable cause does not require that Detullio have evidence sufficient to prove guilt beyond a reasonable doubt.  See Orsatti, supra, 71 F.3d at 482-83 (3d Cir. 1995).  Plaintiff's actual guilt of the crime for which he was arrested is immaterial as to whether the arresting officers had probable cause to arrest him. Dowling v. City of Philadelphia, 872 F.2d 136, 141 (3d Cir. 1989)("the proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense, but whether the arresting officers had probable cause to believe the person arrested had committed the offense.").  Also, the existence of probable cause for any of the offenses for which Batiz was arrested defeats his claim for false arrest, even if probable cause did not exist for the other offenses. See Johnson supra, 477 F.3d at 84 (3d Cir. 2007), (quoting Edwards v. City of Philadelphia, 860 F.2d 568, 576 (3d Cir. 1988).

**b.  Trooper Detullio had probable cause to arrest Batiz for Obstruction.**

Based on a totality of facts and circumstances, Trooper Detullio had probable cause to believe that Batiz was in violation of Obstruction.  In New Jersey, a person commits the offense of obstruction when:

> [h]e purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, <u>or by means of any independently unlawful act</u>.

<u>N.J.S.A.</u> 2C:29-1a [Emphasis added].

"[W]e conclude that under <u>N.J.S.A.</u> 2C:29-1, a police officer acting on a dispatch may be '"lawfully performing an official function"' even if a court later determines that reasonable suspicion was lacking to justify the stop." <u>State v. Crawley</u>, 187 <u>N.J.</u> 440, 452; 901 <u>A.</u>2d 924, 930 (2006), <u>citing</u> <u>Donadio v. Cunningham</u>, 58 <u>N.J.</u> 309, 325-26; 277 <u>A.</u>2d 375, 384 (1971).

Trooper Detullio was dispatched to Batiz's house. [Exhibit E, p.14, lines 2-4]. When he arrived, he spoke to Batiz and then to Gregory Costas, Pack Rat's General Manager. [Exhibit O, p.39]. Costas told Detullio that Batiz had taken a key tool used to load the pod onto Pack Rat's truck. [Exhibit N, p.23, lines 13-22]. At that point, Detullio initiated a theft investigation involving the missing key tool. [Exhibit E, p.24, lines 8-10]. Detullio questioned Batiz, who admitted that he took the key tool. [Exhibit O, p.42, lines 22-25]. Detullio asked Batiz for his pedigree information, consisting of his name, date of birth and social security number. [Exhibit E, p.24, lines 1-7]. Batiz refused to

19

provide the requested information. Id.  Batiz admitted that while at his house, Detullio asked for his pedigree information at least three times. [Exhibit O, p.57, lines 14-22].  Batiz did not provide the requested information because he felt it was irrelevant. Id. at p.57, line 24 through p.58, line 6.  While at Batiz's house, Detullio never received the requested information. Id.

In State v. Camillo, 382 N.J. Super. 113 122, 887 A.2d 1151, 1156 (App Div. 2005), the court stated that defendant's refusal to provide his name, date of birth, and social security number to a state trooper to prepare an incident report "in a very real way, interfered with the trooper's duties."  However, mere refusal to follow a police officer's order without an independently unlawful act is not a violation of New Jersey's Obstruction statute. Id. at 118.

Here, Trooper Detullio also had probable cause that Batiz had committed Theft, which constituted an independent unlawful act. See Camillo, supra, 382 at 118.  The independent charge of Theft constituted an independently unlawful act to satisfy the statutory requirement for the offense of Obstruction.  Therefore, Trooper Detullio had probable cause to arrest Batiz for Obstruction.

It should also be noted that Municipal Court Judge John A. Casarow signed a "Complaint - Warrant," finding probable cause for Theft and Obstruction and set full bail at $2,500.00. [Exhibit C].

20

Batiz was also found guilty of these charges at the Municipal Court trial. [Exhibit E, p.83, line 17 through p.84, line 12].

**c. Trooper Detullio had probable cause to arrest Batiz for Disorderly Conduct.**

The Fourth Amendment does not require a "professionally executed investigation" prior to arrest, it requires only the presence of facts which would lead a reasonably prudent person to believe a crime has been committed or is being committed. <u>Orsatti v. New Jersey State Police</u>, 71 <u>F.</u>3d 480, 484 (3d Cir. 1995). Nor is the officer required to resolve "conflicting evidence that a reasonable-doubt or even a preponderance standard demands." <u>Gerstein v. Pugh</u>, 420 <u>U.S.</u> 103, 121, (1975). Rather, "probable cause determinations have to be made on the spot" and a "determination as to its existence must be based on the totality of the circumstances." <u>Id.</u>

Here, the totality of facts and circumstances confronting Trooper Detullio on the day of the arrest would lead a reasonable and prudent police officer to believe that Batiz had violated the disorderly conduct statute, which states,

> a. Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
>
> (1) Engages in fighting or threatening, or in violent or tumultuous behavior; or

21

    (2)  Creates  a  hazardous  or  physically
    dangerous condition by any act which serves no
    legitimate purpose of the actor.

[N.J.S.A. 2C:33-2a(1)&(2)].

Batiz acknowledged during his deposition that when Detullio arrived, he was involved in a dispute with Pack Rat. [Exhibit O, p.30, line 2 through p.31, line 9]. Batiz stated that Pack Rat showed up in his driveway "to take the pod. And I said that you can't" Id. at p.30, lines 10-23. Detullio stated that when he arrived, Batiz and Pack Rat were "arguing with one another;" therefore, he "immediately separated the two parties." [Exhibit J, p.22, lines 7-10]. Gregory Costas, Pack Rat's General Manager, stated that before Detullio arrived, Batiz had assaulted him by forcing his knee into Costas' ribs. [Exhibit N, p.14, lines 1-7 and p.17, lines 8-11]. Batiz also attempted to kick Pack Rat's driver. Id. Batiz told Detullio that Pack Rat was attempting to take the pod that stored his personal belongings and that Pack Rat was trespassing. He demanded that Detullio make them leave. [Exhibit O, p.30, line 22 through p.31, line 13].

Batiz was upset that Pack Rat was there "to do something they shouldn't be doing." [Exhibit O, p.46, line 11 through p.47, line 11]. He was upset with Trooper Detullio "that he didn't do his job of referring this to civil court and for him coercing me to do

22

something that I was vehemently I (sic) against doing." Id.  He was upset that Trooper Detullio "didn't follow the law and refer this to civil court." Id.

The incident occurred in the front of Batiz's house. Id. at p.53, lines 6-15.  Trooper Detullio stated that after Pack Rat left, Batiz lost his composure, became uncooperative, started yelling at the troopers to get off his property and refused to provide any identifying information. [Exhibit J, p.62, line 11 through p.63, line 22].  At trial, Detullio testified that Batiz became "enraged, yelled, screamed. Yelled, pointed, telling us [troopers] we didn't have a right to be there." [Exhibit E, p.29, lines 12-19].  Detullio observed others watching the incident from across the street. Id. at p.75, lines 8-11.  Batiz's wife, Cordelia Challenger, stated, "I had boxes of stuff, my neighbor from across the street came over and she gave me a tarp to cover it, and she said that she could see what was going on, and since they left, she wanted to bring something for the – something to cover it." [Exhibit L, p.37, lines 17-22].  Challenger's statement supports Detullio's observations that the incident occurred in public while others watched from across the street.

Judge Casarow, the Municipal Court Judge, also found probable cause and signed a "Complaint – Warrant," setting bail for the full amount of $2,500.00. [Exhibit C].  At trial, Judge Casarow stated,

> "I find that the 2C:33-2a(2), if it were by
> itself, I would have found him guilty of that.
> But I find that part of the hindering was
> being disorderly, loud, and not cooperating
> with the police, and by interfering by failure
> to give proper information. I find him guilty
> of the 2C:29-1a.  I will merge the 2C:33-2a(2)
> into it, so that he's only found – being found
> guilty and being hit with a penalty of the
> 2C:29-1a.

[Exhibit E, p.86, lines 3-11].

Based on the totality of facts and circumstances, Detullio had reasons believe that Batiz's overall conduct violated the disorderly person statute.  Therefore, he had probable cause to arrest Batiz for that offense.

**d.   Trooper Detullio had probable cause to arrest Batiz for Hindering Apprehension.**

Pursuant to <u>N.J.S.A.</u> 2C:29-3(b), "[a] person commits an offense if, with purpose to hinder his own detention, apprehension, investigation, prosecution, conviction or punishment for an offense or violation of Title 39 of the Revised Statutes or a violation of chapter 33A of Title 17 of the Revised Statute, he:

> (1) Suppresses, by way of concealment or
> destruction, any evidence of the crime or
> tampers with a document or other source of
> information, regardless of its admissibility
> in evidence, which might aid in his discovery
> or apprehension or in the lodging of a charge
> against him; or
>
> (2) Prevents or obstructs by means of force or
> intimidation anyone from performing an act

24

which might aid in his discovery or detention
or in the lodging of a charge against him; or
(3) Prevents or obstructs by means of force,
intimidation or deception any witness or
informant from providing testimony or
information, regardless of its admissibility,
which might aid in his discovery or
apprehension or in the lodging of a charge
against him; or

(4) Gives false information to a law
enforcement Officer or a civil State
investigator assigned to the Office of the
Insurance Fraud Prosecutor.

Based on facts and circumstances here, Trooper Detullio had

probable cause to arrest Batiz for hindering apprehension.  Batiz

called the state police to his house. [Exhibit O, p.31, lines 4-6].

When Detullio arrived, he spoke to Batiz and then to Costas. Id. at

p.39, lines 23-24.  Pack Rat's General Manager, Gregory Costas,

told Detullio that Batiz had taken a key tool used to load the pod

onto Pack Rat's truck. [Exhibit N, p.23, lines 13-22].  At that

point, Detullio initiated a theft investigation involving the

missing key tool. [Exhibit E, p.24, lines 8-10].  Detullio

questioned Batiz, who admitted that he took the key tool. [Exhibit

O, p.42, lines 22-25].  Detullio asked Batiz for his pedigree

information, consisting of his name, date of birth and social

security number. [Exhibit E, p.24, lines 1-7].  Batiz refused to

provide the requested information. Id.  Batiz admitted that while

Detullio was at the scene, he asked for his pedigree information at

least three times. [Exhibit O, p.57, lines 14-22]. Batiz did not provide the requested information because he felt it was irrelevant. Id. at p.57, line 24 through p.58, line 6. While at Batiz's house, Detullio never received the requested information. Id.

After he was transported to the station, Batiz continued his refusal to provide his pedigree information. [Exhibit O, p.66, lines 18-24]. While at the station, Detullio could not confirm or verify any information as to Batiz's identity, through the use of every tool to which he had access. [Exhibit J, p.99, line 3 through p.100, line 23]. At the time Batiz was transported from the station to the Cumberland County Jail, Detullio still did not know his true identity and was not able to verify any information or obtain a photograph to confirm his identity. Id. at p.146, lines l-9. Because Batiz had been arrested, Detullio had to verify his identity, which had not been done. [Exhibit J, p.105, line 21 through p.106, line 1].

Based on facts and circumstances noted above, Trooper Detullio had sufficient information to warrant a prudent man in believing that Batiz had committed or was committing the offense of Hindering Apprehension. Detullio had sufficient facts which demonstrated that Batiz was attempting to conceal information which might aid in the lodging of charges against him. As a result, Detullio had

probable cause to arrest him for Hindering Apprehension. Furthermore, Detullio presented these facts to Judge Casarow, who also found probable cause and signed a "complaint – warrant," and set full bail in the amount of $2,500.00. [Exhibit C]  Although Batiz was found not guilty of this offense at trial, Trooper Detullio was not required to have evidence sufficient to prove guilt beyond a reasonable doubt. See Orsatti supra, 71 F.3d at 482.

**e.  Based on the totality of circumstances, the seizure of Cordelia Challenger did not rise to the level of an arrest; therefore, her claim for False Arrest should be dismissed.**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The Supreme Court has set forth an objective standard for determining whether a person has been seized for purposes of the Fourth Amendment.  "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. United States v. Frost, 999 F.2d 737, 740 (3d Cir. 1993), citing United States v.

27

Mendenhall, 446 U.S. 544, 554 (1980). "Whether an encounter with a police officer constitutes a search and/or a seizure under the Fourth Amendment requires consideration of "'all the circumstances surrounding the encounter.'" United States v. Smith, 575 F.3d 308, 312 (3d. Cir. 2009).

In this case, defendants concede that Cordelia Challenger was seized; however, her seizure did not amount to an arrest that required probable cause. Notwithstanding the State Police's characterization of the encounter with Challenger as an arrest, her seizure did not require probable cause. "[N]ot all seizures of the person must be justified by probable cause to arrest for a crime. Florida v. Royer, 460 U.S. 491, 498 (1983). "The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." Kaupp v. Texas, 538 U.S. 626, (2003), quoting Terry v. Ohio, 392 U.S. 1 (1968).

However, "[i]n certain circumstances, it can be difficult to distinguish between a Terry stop, which requires only reasonable suspicion, and a de facto arrest, which must be supported by probable cause. United States v. Johnson, 592 F.3d 442, 447-48 (3d Cir. 2010). "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it

28

appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicion quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985). "A court in making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." Id. at 686-87.

In Hayes v. Florida, 470 U.S. 811 (1985), the issue before the court was whether the Fourth Amendment would permit the police to transport a suspect to the station house for fingerprinting, without his consent and without probable cause or prior judicial authorization. In Hayes, police arrived at petitioner's house and spoke to him on his front porch. 470 U.S. at 812. When he was reluctant to accompany them to the police station for fingerprinting, one of the police told him that he would be arrested. Id. Petitioner stated that he would rather go with the officers to the station than to be arrested. Id. He was taken to the station and fingerprinted. Id. at 813. He was arrested when it was determined that his prints matched those left at the crime

scene. Id.  The State contended that the Fourth Amendment did not forbid an investigative detention for the purpose of fingerprinting, even in the absence of probable cause or a warrant. Id. at 814.  In rendering its decision, the Hayes court stated,

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.

Id. at 815-16.

Unlike Hayes, the facts in this case do not establish that Trooper Detullio's encounter with Cordelia Challenger amounted to an arrest because Challenger voluntarily drove an unregistered vehicle to the State Police station to check on her husband, Luis Batiz. [Exhibit L, p.51, line 6 through p.52, line 23].  She was briefly detained because Detullio saw her when she arrived and immediately recognized that she was driving the same vehicle that he had discovered earlier was not registered. [Exhibit J, p.117, lines 11-18].  Therefore, Detullio had reasonable suspicion to detain Challenger upon her arrival at the station.  Even if the

court accepts Challenger's claim that someone called and told her to come to the station, she could not identify the caller as Detullio or Trooper Brown. [Exhibit L, p.51, line 23 through p.54, line 15]. Trooper Detullio and Brown denied that any such call was made because Batiz had been arrested and was not free to leave. [Exhibit J, p.116, lines 20-24 and Exhibit K, p.32, lines 17-23]. Also, Challenger admitted that no one from the State Police came to her house to escort her to the police station, and no one followed her there. [Exhibit L, p.52, lines 15-23]. She admitted that she got her keys and voluntarily drove to the Station. Id. She further admitted that she drove an unregistered vehicle to the station. Id. at p.54, lines 6-25.

When she arrived at the station, Detullio immediately recognized her vehicle as being unregistered because he had conducted a motor vehicle check on the same Honda CRV, when it was blocking Pack Rat's truck in the driveway. [Exhibit E, p.28, line 3-16] [Exhibit J, p.86, lines 6-23 and p.117, lines 11-18]. Challenger arrived at the station at 12:33 P.M., and was released at 1:34 P.M., the same day. [Exhibit B]. Her detention was only for approximately sixty one minutes. Id. During her detention, she stated that she was left in the front office and was handcuffed to a bench, on which she sat. [Exhibit L, p.54, lines 1-6. She was not photographed or fingerprinted. Id. at lines 12-13. During

31

Challenger's detention, Trooper Detullio drafted a summons for her expired vehicle registration and made arrangements with "A-1 Towing" to have the vehicle impounded. [Exhibit L, p.54, lines 6–25].  When asked what the troopers were during while she was handcuffed to the bench, Challenger acknowledged that they were "doing their paperwork." Id. at p.55, lines 15-20.  Detullio also questioned Challenger about Batiz's full name and date of birth. Id. at p.53, lines 9-17.  She refused to provide the information and was also issued a summons for hindering the apprehension of another. Id. at p.53, line 25 through p.54, lines 1 – 5 and p.66, lines 14 -25.

After she was given copies of the summons, Challenger stated that they told her she was free to leave; however, she decided to wait for Batiz, who was being transported to the county jail. Id. at p.56, lines 12–17.  Challenger's vehicle was towed and impounded. [Exhibit B].  Detullio drove Challenger to the Department of Motor Vehicles to allow her to register her vehicle. [Exhibit L, p.57, lines 11–13].  Challenger stated that she was not handcuffed when she was escorted to the Department of Motor Vehicles. Id. at p.56, line 24 through p.57, line 4.  She had no further contact with the State Police. Id. at p.67, lines 10 – 12.

Based on these facts, Challenger's detention did not rise to the level of an arrest.  She voluntarily drove to the station in a

vehicle with an expired registration.  Her detention lasted no longer than was necessary to draft summons, and to make arrangements to have her vehicle towed.  Trooper Detullio had reasonable suspicion to detain Challenger as a result of the unregistered vehicle.  She was not fingerprinted or photographed.  Furthermore, Detullio recognized that Challenger was driving an unregistered vehicle before he asked her any questions about Batiz.  "The timing of the seizure is significant – if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure. But if the seizure occurred before the flight, . . . then the flight '"plays no role in the reasonable suspicion analysis'"".  United States v. Smith, 575 F.3d 308, 312 (3d Cir. 2009), citing United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006).  Here, Detullio had reasonable suspicion before he detained Challenger.

It should also be noted that the length of time Challenger was seized is not considered excessive.  Courts have refused to place a rigid time limit on the duration of investigatory seizures. See United States v. Frost, 999 F.2d 737, 742 (3d Cir. 1993).  As the court stated in Frost,

> we understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the

33

> equally important need to allow authorities to
> graduate their responses to the demands of any
> particular situation.

Id.  Here, Challenger's detention lasted one hour, during which Trooper Detullio drafted summons and made arrangements to have her vehicle towed and impounded. [Exhibit B].

As for handcuffing Challenger to a bench, such practice also does not create a de facto arrest.  "The Supreme Court has stated that, when police officers make an investigative stop, they may take such steps as are '"reasonably necessary to protect their personal safety and to maintain the status quo."'  United States v. Edwards, 53 F.3d 616, quoting United States v. Hensley, 469 U.S. 221 (1985).  "Most courts, including ours, have concluded that blocking a suspect's vehicle even with guns drawn is not an arrest per se."  United States v. Coker, 223 Fed. Appx. 136, 141 (3d Cir. 2007), citing United States v. Perea, 986 F.2d 633, 636, 644 (2d Cir. 1993)(blocking suspect's car with three unmarked cars and approaching with weapons drawn was not an arrest).  "'[T]here is no per se rule that pointing guns at people or handcuffing them constitute[s] an arrest.'"  Croker, 223 Fed. Appx. at 141.  However, the use of guns and handcuffs during an investigatory stop must be justified, and we are required to look at the intrusiveness of all aspects of the incident in the aggregate.  Id.  Here, Cordelia Challenger voluntarily drove to the station, where she was detained

34

and charged with driving an unregistered vehicle and Hindering Apprehension of Another. She was not fingerprinted or photographed. Restricting her movement within the station during her detention was not unreasonable and did not convert her encounter with the State Police into an arrest. Therefore, her seizure did not require probable cause.

**f.   Even if Challenger's seizure amounted to an arrest, Trooper Detullio had probable cause to arrest her for Hindering the Apprehension of Another.**

The evidentiary standard for probable cause is significantly lower than the standard which is required for conviction". Hinter v. Bryant, 502 U.S. 224, 228 (1991)(quoting Beck v. Ohio, 379 U.S. 89, 91 (1964). Moreover, if "at the moment the arrest was made . . . the facts and circumstances within [the defendants'] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that the plaintiff had violated the law, probable cause is present. Id.

Here, probable clause also existed to arrest Cordelia Challenger for Hindering Apprehension of Another. N.J.S.A. 2C:29-3(a) states,

> A person commits an offense if, with purpose to hinder the detention, apprehension, investigation, prosecution, conviction, or punishment of another for an offense . . . he (3) Suppresses, by way of concealment or destruction, any evidence of the crime, or tampers with a witness, informant, document or

35

other source of information, regardless of its
admissibility in evidence, which might aid in
the discovery or apprehension of such person
or in the lodging of a charge against him.

Cordelia Challenger voluntarily appeared at the state police station. [Exhibit L, p.52, lines 18-23. She drove the same Honda CRV that Detullio had seen at the residence. [Exhibit E, p. 28, lines 3-16] [Exhibit J, p.86, lines 6-23 and p. 117, lines 11- 18]. Detullio knew that the vehicle's registration had expired. Id. As a result, Detullio had reasonable suspicion to conduct an investigatory stop for purposes of the expired registration. See Kaupp supra, 538 U.S. 626 (2003).

Challenger stepped into the lobby of the station and trooper Detullio approached her. [Exhibit L, p.52, line 24 through p.53, line 3] [Exhibit J, p.117, lines 4-10]. During the investigatory stop, Detullio also questioned Challenger about her husband's pedigree information. [Exhibit L, p.53, lines 5-17] [Exhibit J, p.117, lines 19-24]. Detullio knew that Challenger lived with Batiz and he believed that she could have provided Batiz's pedigree information if she wanted to. [Exhibit J, p.119, line 22 through p.120, line 12]. Challenger refused to provide the information. [Exhibit L, p.53, lines 15-17] [Exhibit J, p.118, lines 21-25]. After refusing to provide the information, she was charged with

Hindering Apprehension of Another. [Exhibit L, p.53, line 25 through p.54, line 5].

Based on the above, there were sufficient facts and circumstances to warrant a prudent officer in Trooper Detullio's position, to believe that Challenger had committed the offense of hindering the apprehension of her husband, by refusing to provide his identity. As Batiz's wife, it is not unreasonable for Detullio to conclude that she was in a position to provide information as to the identity of her husband, and that her continued refusal to do so was purposeful. Challenger admitted in her deposition that she refused to provide the requested information. The arresting officer must only reasonably believe at the time of the arrest that an offense is being committed, a significantly lower burden than proving guilt at trial. Wright v. City of Phila., 409 F.3d 595, 602 (3d Cir. 2005). Trooper Detullio was not required to have evidence sufficient to prove guilt beyond a reasonable doubt and Challenger's actual guilt of the crime for which she was arrested is immaterial as to whether probable cause exited at the time. See Orsatti, supra, 71 F.3d at 482-83 (3d Cir. 1995), and Dowling, supra, 872 F.2d at 141 (3d Cir. 1989) respectively.

Also, regarding adjudication of the charges against Challenger, the municipal court judge stated during the municipal court trial that, "[a]s far as Ms Challenger goes, I do not find

there's proof beyond a reasonable doubt of the [Hindering Apprehension of Another] 2C:29-3a(1)." [Exhibit E, p.86, lines 14-18].  The judge did not find that Trooper Detullio lacked probable cause.  In fact, the court specifically stated that "I find that there may be evidence of other parts of 29 - - 2C:29-3, but not of the 3a(1) section." Id.  The prosecutor also acknowledged that Challenger was not charged under the proper section of the statute. Id. at p.80, line 21 through p.81, line 25.  As a result, Trooper Detullio had probable cause to support the charge of Hindering Apprehension of Another.

As for plaintiffs state constitutional claims under the New Jersey Civil Rights Act (NJCRA), this District has regularly interpreted the NJCRA as being parallel to § 1983. Hottenstein v. City of Sea Isle City, 977 F. Supp. 2d 353, 2013 WL 5603839, at *6 (D.N.J. 2013)(unreported); Pettit v. New Jersey, No. 09-3735, 2011 U.S. Dist. LEXIS35452, 2011 WL 1325614, at *3 (D.N.J. March 30, 2011)(unreported).

### POINT II

### PLAINTIFFS' CLAIM FOR FALSE IMPRISONMEMNT SHOULD BE DISMISSED BECAUSE TROOPER DETULLIO HAD PROBABLE CAUSE.

To substantiate a claim of false imprisonment, plaintiffs must establish that they were arrested without probable cause and subsequently detained pursuant to that unlawful arrest. Adams v.

Selhorst, 449 Fed. Appx. 198, 201 (3d Cir. 2011)(quoting Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995). Probable cause is an "absolute defense to . . . false arrest, false imprisonment and § 1983 claims." Wildoner v. Borough of Ramsey, 162 N.J. 375, 744 A.2d 1146 (2000).

Based on arguments made in Point-I Sections a - f above, Trooper Detullio had probable cause to arrest Batiz and Challenger. Also as noted in Point I, Section e, Detullio's encounter with Challenger did not rise to the level of an arrest, which undermines her attempt to establish the necessary element of an arrest to support her claim of false imprisonment. Therefore, their claims for false imprisonment should be dismissed.

## POINT III

**BATIZ'S 42 U.S.C. § 1983 CLAIM FOR MALICIOUS PROSECUTION SHOULD BE DISMISSED BECAUSE DEFENDANTS HAD PROBABLE CAUSE AND THERE IS NO SHOWING THAT BATIZ WAS SUBJECT TO ADDITIONAL RESTRICTIONS BEYOND THOSE ATTRIBUTABLE TO THE CHARGES FOR WHICH PROBABLE CAUSE EXISTED.**

"To prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to

justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003).

In Johnson, the court adopted the Second Circuit's holding in Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991), that "probable cause on one charge does not foreclose a malicious prosecution cause of action against a defendant for having brought criminal charges involving different elements." 477 F.3d at 84-85.  However, as pointed out here, probable cause existed in this case for each offense against Luis Batiz and Cordelia Challenger; therefore the claim for malicious prosecution should be dismissed.

**a.    Detullio had probable cause to arrest Batiz for each charge.**

Probable cause is an absolute defense to § 1983 and state law claims for false imprisonment and malicious prosecution.  Herman v. City of Millville, 66 Fed. Appx. 363, 366 n.3 (3d Cir. 2003), Wildoner v. Borough of Ramsey, 162 N.J. 375, 389 (2000).

In this case, based on the probable cause analysis in Point-I, Sections a - d above, probable cause existed for each offense for which Batiz was arrested.

**b.    Batiz cannot show that charge(s) for which probable cause did not exist, resulted in further restrictions on his liberty.**

40

Based on the circumstances of this case, if this Court finds that probable cause existed for one or more offenses, Batiz's malicious prosecution claim should be dismissed.  As the court stated in Johnson, supra, a plaintiff cannot establish a Fourth Amendment malicious prosecution case if the prosecution for the additional charges for which probable cause did not exist in no way resulted in additional restrictions of his liberty beyond those attributable to the prosecution for charge(s) for which there was probable cause. 477 F.3d at 86.

Here, Batiz was charged with Disorderly Conduct, Theft, Obstruction, and Hindering Apprehension. [Exhibit C].  After he was charged with all of the offenses simultaneously, he was incarcerated at the Cumberland County Correctional Center. [Exhibit J, p.108, lines 4-7].  His incarceration for all charges was in lieu of $2,500.00 bail. [Exhibit C].  Batiz was released after his wife, Cordelia Challenger, faxed a copy of Batiz's expired passport to Immigration Customs and Enforcement, and posted bail. [Exhibit L, p.68, line 19 through p.69, line 17].

As shown here, Batiz received multiple charges from the same incident. [Exhibit C].  There is no showing that, as a result of prosecution, his liberty was restricted beyond the restrictions that resulted from charges for which probable cause existed.  A claim for malicious prosecution cannot be established, absent a

showing of deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. See Johnson, supra, 477 F.3d at 85. Accordingly, if Batiz did not suffer a deprivation of liberty specifically with respect to the charges that lacked probable cause, he cannot assert a malicious prosecution claim.

### c. The intervening exercise of independent judgment broke the chain of causation between Detullio's arrest and Batiz's incarceration.

The Superior Court of New Jersey, Appellate Division, articulated the law with respect to a break of the chain of causation to a malicious prosecution claim. See Freeman v. State, 347 N.J. Super. 11; 788 A.2d 867 (App. Div.), certif. denied, 172 N.J. 178 (2002). "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment. At least that is so in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment." Id. at 25, quoting Townes v. City of New York, 176 F.3d 138, 147 (2d Cir.), cert. denied, 528 U.S. 964 (1999). Intervening acts that will break the chain of causation as to the arresting police officers include intervening decisions of the prosecutor, grand jury, judge, and jury. See Townes, supra, 176 F.3d at 147.

42

Here, after Detullio arrested Batiz, he prepared a Complaint – Warrant and presented facts of the case to Municipal Court Judge John A. Casarow. [Exhibit J, p.110, lines 8-16] [Exhibit C].  Judge Casarow found probable cause for each charge and set full bail for all charges in the amount of $2,500.00. [Exhibit C].  Batiz was required to post bail before he was released. [Exhibit L, p.68, line 19 through p.69, line 17].  In addition, Cris D'Arrigo, the Municipal Prosecutor, made the decision to prosecute Batiz on all four charges. [Exhibit E, generally].

Absent evidence that Detullio misled Municipal Court Judge Casarow and/or Municipal Prosecutor D'Arrigo, the finding of probable cause, the setting of bail and prosecution of the case, serve to break the chain of causation as to Trooper Detullio.  Such intervening acts of independent judgment by the judge and prosecutor broke the chain of causation and Trooper Detullio should not be held liable for claims of malicious prosecution.

<u>**POINT IV**</u>

**PLAINTIFFS 42 U.S.C. § 1983 CLAIM FOR ABUSE OF PROCESS SHOULD BE DISMISSED BECAUSE THERE IS NO SHOWING THAT DEFENDANTS ABUSED THE LEGITIMATE PURPOSE OF THE LEGAL PROCESS.**

"A [S]ection 1983 claim for malicious abuse of process lies when 'prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by law." <u>Rose v. Bartle</u>, 871

F.2d 331, 350 n17 (3d Cir. 1989). (quoting Jennings v. Shuman, 567 F.2d 1213, 1217, (3d Cir. 1989). As the court explained in Jennings, "if the defendant justifies issuance of process by untruthfully saying that the plaintiff solicited burglary and uses the process only to have him jailed, this is malicious use only. It is not malicious abuse because jailing is the purpose for which criminal process was intended.  However, if the defendant has process issued based on the truthful statement that the plaintiff solicited burglary and then uses the threat of prosecution for purposes of extortion, this is malicious abuse only." Id. at 1219-20.

### a.   There is no showing that Trooper Detullio abused the legal process.

In this case there is absolutely no showing that Trooper Detullio used the legal process or the prosecution of Luis Batiz or Cordelia Challenger for a purpose other than that intended by law. Accepting plaintiffs claim as true, that Trooper Detullio and others threatened Batiz with incarcerating his wife, there is no evidence that Trooper Detullio used the legal process for any purpose other than to follow through with processing Batiz and Challenger for offenses of which each of them was charged. Notwithstanding plaintiff's allegations, Batiz and Challenger were charged and Batiz was incarcerated on $2,500.00 full bail, based on

a warrant signed by Judge Casarow. [Exhibit C].  Challenger was issued summons and released on her own recognizance.  [Exhibit L, p.56, lines 12-17].  Batiz and Challenger appeared in court on August 14, 2010.  [Exhibit E, p.3, lines 1-12].  There is no evidence that once process was initiated, Trooper Detullio used the legal process for some nefarious purpose that is outside the scope of that which is intended by law.  The evidence shows that after legal process was initiated, Trooper Detullio's only involvement was to testify at the Municipal Court trial. [Exhibit E generally].  "For abuse of process to lie, the improper use must be the primary purpose of the proceeding and '"there is no action for abuse of process when the process is used for the purpose for which it is intended."'  Gebhart v. Barker, 574 Fed. Appx. 156, 160 (3d Cir. 2014), quoting Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 305 n.2 (3d Cir. 2003).

**b.   Trooper Detullio did not have the authority to issue an immigration detainer and when the detainer was issued, he still did not have sufficient information to verify Batiz's identity.**

As for plaintiffs' claim that Trooper Detullio "wrongfully" initiated an immigration detainer against Batiz, such claim lacks merit.  Detullio contacted ICE to obtain their assistance in his attempt to identify Batiz.  Batiz refused to provide his name or date of birth before he was arrested. [Exhibit E, p.24, lines 1-7].

When he was arrested, Batiz did not have any form of identification on his person. [Exhibit J, p106, lines 2-18]. Batiz has never been issued a driver's license in his adult life. [Exhibit O, p.74, line 25 through p.75, line 2]. After he was arrested, any information that Batiz provided had to be verified through independent database or reliable methods. [Exhibit J, p.104, line 19 through P.106, line 1]. Batiz refused to be fingerprinted, which would have positively identified him through the Automated Fingerprint Identification System. [Exhibit O, p.68, line 20 through p.69, line 21] [Exhibit J, p109, line 23 through p.110, line 7].

Detullio could not confirm Batiz's identity through various databases. [Exhibit J, p. 124, line 24 through p. 125, line 19]. Based on Batiz's overall behavior, Detullio thought that he could be "a wanted fugitive, or someone that he didn't say he was." Id. at p.123, lines 17-21. Detullio contacted ICE as an additional source to identify Batiz. [Exhibit J, p.123, line 10 through p.124, line 21]. When he contacted ICE, Detullio was not trying to enforce federal immigration laws. [Exhibit J, p.144, lines 23-25]. The Immigration Detainer lists Batiz as "John Doe, aka Batiz Louise." [Exhibit D]. At the time that Detullio transported Batiz from the station to the Cumberland County Jail, Batiz's true identity was still unknown. [Exhibit J, p.146, lines 2-24]. As a

46

result, it was appropriate for Detullio, a law enforcement officer, to use all available resources to ensure that Batiz was not a wanted fugitive or dangerous person, before releasing him.

Furthermore, by statute, Detullio had no authority to issue an immigration detainer.  Pursuant to 8 C.F.R. § 287.7(b)(3)(b), only Border patrol agents, Special Agents, Deportation Officers, Immigration Inspectors, Adjudication officers, Immigration Enforcement Agents, Supervisory INS personnel and Immigration Officers who need the authority, can issue detainers.  A New Jersey State Trooper is not authorized to initiate or issue an INS detainer.  See 8 C.F.R. § 287.7(b)(3)(b) supra.  However, if an arrestee is identified as being the subject of a detainer, a criminal justice agency is permitted to maintain custody of the arrestee for forty eight hours pursuant to 8 C.F.R § 287(d)(3)(d), which states,

> Temporary detention at Department request. Upon a determination by the [INS] to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the department.

As noted above, an INS detainer is only effective for forty eight hours after the person is no longer detained by a law enforcement agency.  Here, Batiz was held in lieu of bail in the

47

amount of $2,500.00.  After Challenger posted bail, Batiz was released the same day. [See Challenger Deposition Transcript, Exhibit L, p.62, line 22 through p.63, line 4.  There is no evidence here that the detainer, which only became effective after Batiz was no longer detained by the State, prolonged his detention.  Therefore, even if Batiz was subject to a detainer, it had no impact on his incarceration and did not prolong his incarceration in any way beyond his independent ability to make bail.

Batiz was released approximately two weeks later, after his wife, Cordelia Challenger, faxed an expired copy of his passport to ICE, and paid a bail bondsman $300.00. [Exhibit L, p.60, line 16 through p.61, line 25].  Challenger stated that had she not paid the $300.00, "he would have to stay there." Id. at p.69, lines 16-17.

## POINT V

### PLAINTIFF'S 42 § 1985 CLAIM FOR CONSPIRACY TO DEPRIVE CIVIL AND CONSTITUTIONAL RIGHTS SHOULD BE DISMISSED BECAUSE THIS CLAIM CANNOT SURVIVE IF THE UNDERLYING CLAIMS ARE DISMISSED.

If this court grants defendants' motion for summary judgment as to the predicate claims, the court should also do the same with respect to the conspiracy claim because this claim is based upon the predicate claims. See Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 407 (3d Cir. 2000) ("verdict on civil

48

conspiracy should yield to a finding for the defendant on the underlying tort's existence."); Middlesex Concrete Products & Excavating Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 516 (1962) ("The essence of an action such as here brought is not the conspiracy but rather the underlying wrong and the resulting damage caused thereby, since a conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action.").

## POINT VI

### TROOPER DETULLIO AND BROWN ARE ENTITLED TO QUALIFIED IMMUNITY

"Qualified or 'good faith immunity' is an affirmative defense" to a § 1983 claim. Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982). A law enforcement officer is entitled to judgment as a matter of law on a § 1983 claim by establishing that, even if probable cause was absent, a reasonable officer would have believed it was present. Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

49

"[Q]ualified immunity is an objective question to be decided by the court as a matter of law." Curley v. Klem, 499 F.3d 199, 210 (3d Cir. 2007).

Here, it was objectively reasonable for Trooper Detullio to believe that probable cause existed for all charges.  Also, his belief that probable cause existed was supported by Judge Casarow, who signed the warrant, set bail and later found Batiz guilty of all charges except Hindering Apprehension.  The charge for Theft was affirmed on appeal to the Superior Court – Criminal Division. Although the Appellate Division reversed Batiz's conviction, it did so based on an affirmative defense and on the basis of facts Trooper Detullio could not have determined at the scene.

The Appellate Division held that it was not established that Batiz had a purpose to deprive Pack Rat of the stolen key tool. Trooper Detullio had no way of knowing and could not have made such determination at the incident.  "[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause exists to initiate a criminal prosecution are entitled to qualified immunity." Luthe v. The City of Cape May, 49 F.Supp. 2d 380, 396 (D.N.J. 1999).

Furthermore, Trooper Brown had no role in Batiz's arrest and he had no contact with Cordelia Challenger when she arrived at the station.  It is noted that Batiz claimed that Trooper Brown

"elbowed her [Cordelia Challenger] or something to that effect"t or "hit her with the flashlight." [Exhibit O, p.61, line 23 through p.62, line 6].  However, in describing the same encounter with Trooper Brown, Challenger stated that the other troopers were "rude," but she did not indicate that she was physically touched. [Exhibit L, p.48, line 25 through p.49, line 24].  As a result, Troopers Detullio and Brown are entitled to Qualified Immunity.

## **CONCLUSION**

For the foregoing reasons, the motion for summary judgment should be granted.

Respectfully submitted,

JOHN J. HOFFMAN
ACTING ATTORNEY GENERAL OF NEW JERSEY

By:  s/ Marvin L. Freeman
     Marvin L. Freeman
     Deputy Attorney General

DATED:  December 23, 2014